# In the United States Court of Federal Claims

No. 24-2053
Filed: August 8, 2025
Reissued: August 26, 2025[†]

---

**JACOBS ENGINEERING GROUP, INC.,**

               *Plaintiff,*

**v.**

**THE UNITED STATES,**

               *Defendant.*

---

*Robert J. Symon*, with *Nathaniel J. Greeson* and *Owen E. Salyers*, Bradley Arant Boult Cummings LLP, Washington, D.C., for Plaintiff.

*Elinor J. Kim,* Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, *Steven J. Gillingham*, Assistant Director, *Patricia M. McCarthy*, Director, *Yaakov M. Roth*, Acting Assistant Attorney General, Washington, D.C., with *Joshua Fix*, Major, Judge Advocate, Trial Attorney, Contract Litigation & Intellectual Property Division, U.S. Army Legal Services Agency, Fort Belvoir, VA, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

      In procurement law, as with life's missteps, a stumble is not always a fall. Based on this premise, establishing prejudice is essential in bid protests because even if an agency erred, a protester must show that it *mattered*. In this case, Jacobs Engineering Group, Inc. ("Jacobs"), challenges its exclusion from further negotiations for architect-engineer services meant to support National Guard facilities nationwide. Jacobs argues that the agency unreasonably evaluated its submission under multiple criteria, resulting in its non-selection despite being rated "highly qualified." On review, Jacobs has not demonstrated sufficient grounds to disturb the agency's determination. Accordingly, Jacobs's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 20), is **DENIED**. The United States' Cross-Motion for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 21), is **GRANTED**.

---

[†] This Opinion was originally issued under seal, (ECF No. 30), and the parties were directed to file a notice of redactions consistent with the Court's instructions. The Court accepts all jointly proposed redactions, (ECF No. 32). The sealed and public versions of this Opinion differ only to the extent of those redactions, offeror names, the publication date, and this footnote.

# I.    Background

The National Guard Bureau ("NGB") issued this underlying procurement under the Brooks Act, 40 U.S.C. § 1101 *et seq.*, see Pub. L. No. 107-217, § 1, 116 Stat. 1062 (2002). The Brooks Act governs how the federal government procures architect-engineer ("A-E") services, emphasizing the importance of qualifications over cost. 40 U.S.C. § 1101. The statute requires agencies to select firms based on demonstrated competence, technical expertise, and relevant experience, rather than based on the lowest price. *Id.* The process involves first identifying the most qualified firms and then negotiating a fair and reasonable price with the top-ranked firm. § 1103. If an agreement cannot be reached, the agency moves to the next firm in the ranking. § 1104(b). This approach is designed to ensure that critical engineering and design work is entrusted to professionals whose expertise meets the project's needs, rather than risking subpar performance through low bids. *See Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 316 (2010) (discussing regulatory framework of the Brooks Act), *aff'd*, 440 F. App'x 926 (Fed. Cir. 2011).

Federal Acquisition Regulation ("FAR") subpart 36.6 implements the Brooks Act, establishing the procedures for acquiring A-E services, including public announcements of contract opportunities, evaluation of technical qualifications, and negotiation protocols. 48 C.F.R. (FAR) § 36.602-1(a) (2025). Synopses under FAR 36.6 are reserved exclusively for A-E services—including facility design, engineering analyses, mapping, and surveying—and require that firms be evaluated on merit before cost considerations are addressed. FAR 36.600, 36.601-4, 36.602-1. In a FAR 36.6 synopsis, firms typically respond by detailing their qualifications, relevant experience, and professional capabilities. FAR 36.603(b). Agencies then evaluate submissions based on criteria such as specialized experience, past performance, capacity to perform the work, geographic location, and other project-specific factors. FAR 36.602-1(a). Once those evaluations are complete, the agency enters price negotiations only with the most highly qualified firms, in line with the Act's emphasis on quality and professional integrity. *See* FAR 36.605.

In this bid protest, Jacobs is an incumbent contractor on a nationwide contract under which NGB previously obtained horizontal and vertical A-E services from 2015 to 2022.[1] (Administrative Record ("AR") 1312).[2] On November 9, 2023, the NGB issued this Synopsis for a $255 million, multiple-award, indefinite-delivery, indefinite-quantity ("IDIQ") contract covering vertical A-E services across eight geographic regions and Guam.[3] (AR 2542). The Synopsis sought A-E investigative and design services, including construction documentation,

---

[1] Vertical A-E services pertain to facility design, including buildings and similar structures, whereas horizontal A-E services encompass infrastructure planning, such as roads and highways. (AR 1312–13).

[2] The Administrative Record was uploaded to Justice Enterprise File Sharing System ("JEFS") and the parties later submitted a Joint Appendix with cited portions of the record, (ECF No. 26).

[3] Synopsis No. W9133L24R6100 ("the Synopsis"). In contrast to other FAR Parts, A-E contracts under FAR 36.6 are solicited via a text-based synopsis rather than standard solicitation forms.

engineering standards, interior design, and various technical and planning studies. (AR 2545, 2547). The Synopsis indicated NGB's intent to award up to ten IDIQ contracts, including three awards under the unrestricted category at issue in this protest.[4] (AR 2542). Task orders were expected to range from $100 thousand to $15 million. (AR 2542–45). The Synopsis underwent four amendments, with the final amendment issued on December 8, 2023. (AR 2542). NGB received fifteen proposals under the unrestricted category; eleven proposals were deemed "highly qualified," including Jacobs. (AR 8805).

Following the factors established in FAR Subpart 36.6, the Synopsis iterated five primary evaluation criteria and respective sub-criteria:

| Primary Criteria | Sub-criteria[5] |
|---|---|
| A. Professional Qualifications necessary for satisfactory performance of required services ("Professional Qualifications") | 1) **Project Manager** <br> 2) **Architect** <br> 3) **Civil Engineer** <br> 4) **Structural Engineer** <br> 5) **Mechanical Engineer** <br> 6) **Electrical Engineer** <br> 7) **Fire Protection Engineer** <br> 8) **Cost Estimator**[6] <br> 9) Geotechnical Engineer <br> 10) Security/Cyber Security Specialist <br> 11) Environmental Engineer |
| B. Specialized Experience and Technical Competence in the type of work required, including, as appropriate, experience in sustainable design, energy conservation, pollution prevention, waste reduction, and the use of recovered materials ("Specialized Experience and Technical Competence") | 1) Design experience for aircraft maintenance facilities, including plans, specifications, cost estimates, and adherence to Unified Facilities Criteria ("UFC") and Guide Specifications. <br> 2) Design of aircraft operations facilities (e.g., squadron operations, simulators, control towers), with full documentation and integration of UFC standards. <br> 3) Development of design plans for entry control points, ranges, and support facilities, incorporating UFC and Guide Specifications. <br> 4) Master planning and related government programming and planning documents. |

[4] Seven awards were reserved for small businesses; "unrestricted" awards refer to awards to companies "Other than Small Businesses." (AR 2542–43).

[5] For brevity, the listed sub-criteria are summarized from, but do not replicate verbatim, those set forth in the Synopsis. (*See* AR 2545–50). Relevant sub-criteria will be quoted directly from the applicable section of the Synopsis as needed for the analysis.

[6] The evaluations indicate that NGB placed more weight on the top eight sub-criteria. (*See* AR 6236 (bolded)).

3

| | |
|---|---|
| | 5) Preparation of design-build bridging documents for military, government, or commercial use. |
| | 6) Submission of five project cost estimates for design-bid-build efforts; comparison with awarded construction costs; explanation of cost management practices and variances exceeding 10%. |
| | 7) Experience designing and surveying for environmental abatement, including asbestos, lead-based paint, and other hazardous substances. |
| | 8) Familiarity with National Environmental Policy Act ("NEPA") processes and documentation requirements under relevant statutes, Council on Environmental Quality ("CEQ") regulations, Air Force guidelines, and environmental analysis procedures. |
| | 9) Experience applying Federal Aviation Administration ("FAA") regulations, Air Installations Compatible Use Zones ("AICUZ") criteria, and Unified Facilities Criteria ("UFC") 3-260-01 design constraints. |
| | 10) Demonstrated capability in conducting facility condition assessments. |
| C. Capacity to accomplish multiple task orders in the required time | 1) Outline the quality management plan, including quality assurance tools, processes, personnel, and relevance to team composition. |
| | 2) Summarize prior collaboration between prime and key sub-consultants, highlighting coordination methods. |
| | 3) Provide the firm's current capacity to execute multiple Air National Guard ("ANG") and the Army National Guard ("ARNG") task orders nationwide. |
| D. Past Performance | None |
| E. Location in the general geographical area of the project and knowledge of the locality of the project areas ("Location") | 1) Describe the team's familiarity with design requirements applicable to these locations. |
| | 2) Provide your method for assessing environmental and regulatory factors— including hydrology, geology, seismic risks, climate, building codes, and industry standards. |
| | 3) Describe measures you take to adapt standard design details to local industry/construction trades standard practice. |

4

(*See* AR 2545–50). Criteria A, B, C, and E were assessed using a color-coded scale ranging from "Unacceptable" to "Outstanding." (AR 6239). In relevant part, the color-coding indicated:

> BLUE (Outstanding) – . . . Proposal meets requirements and indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and the risk of unsuccessful performance is low.

> PURPLE (Good) – . . . Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and the risk of unsuccessful performance is low to moderate.

(*Id.*).[7] Criteria D, Past Performance, was evaluated on relevance and confidence. (AR 6240). Each offeror received a rating of "Very Relevant," meaning that "[p]resent/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires[,]" and "Satisfactory Confidence," meaning that "based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort." (*Id.*).

Criteria were ranked by importance, along with their respective sub-criteria. (AR 2549). Evaluation was intended to be conducted in two phases with two boards—the Pre-Selection Board and the Final Selection Board. (AR 6237); *see* FAR 36.602-2. In the first phase, the Pre-Selection Board relied on individual Pre-Selection Worksheets as working documents in the development and finalization of the Pre-Selection Report. (AR 9730–31). In the second phase, the Final Selection Board engaged in discussions and drafted the Final Selection Report, which included proposal rankings and detailed ratings per the criterion. (AR 9731). The Final Selection Report sets forth the Final Selection Board's ultimate ratings and recommendations, including each offeror's overall ranking, detailed ratings under each primary evaluation criterion, and a corresponding summary of the rationale for those ratings. (AR 9731; *see* AR 6317–19)

For the Final Selection Report, the Final Selection Board also compiled a table presenting the adjectival ratings assigned to each offeror and ranked the eleven most qualified firms. (AR 6236, 6238). The concluding section summarized the rankings and highlighted the "Outstanding" ratings and notable strengths of the top three most highly qualified offerors. (AR 6380–81). Below is a breakdown of the top five rankings and their respective scores[8]:

---

[7] Because the top five offerors did not receive a rating lower than Purple (Good), the Court will not discuss the remainder of the scale.

[8] Information in this chart was compiled from the Selection Authority's "Unrestricted Final Selection Report for Vertical Multiple Region National Guard IDIQ for A-E Services" located at Tab 114 of the Administrative Record. The offerors are listed in order of ranking. Although the Synopsis includes Criteria F as a tie-breaking mechanism, there is no indication it was invoked; accordingly, it is not reflected in the chart.

|  | (1) Offeror #1 | (2) Offeror #2 | (3) Offeror #3 | (4) Offeror #4 | (5) Jacobs |
|---|---|---|---|---|---|
| *A. Professional Qualifications* | Blue (Outstanding) | Blue (Outstanding) | Purple (Good) | Purple (Good) | Purple (Good) |
| *B. Specialized Experience and Technical Competence* | Blue (Outstanding) | Blue (Outstanding) | Blue (Outstanding) | Blue (Outstanding) | Blue (Outstanding) |
| *C. Capacity to accomplish multiple task orders in the required time* | Purple (Good) | Purple (Good) | Blue (Outstanding) | Blue (Outstanding) | Blue (Outstanding) |
| *D. Past Performance* | Very Relevant  Satisfactory Confidence | Very Relevant  Satisfactory Confidence | Very Relevant  Satisfactory Confidence | Very Relevant  Satisfactory Confidence | Very Relevant  Satisfactory Confidence |
| *E. Location* | Blue (Outstanding) | Blue (Outstanding) | Blue (Outstanding) | Blue (Outstanding) | Purple (Good) |

(*See* AR Tab 114). As Jacobs was not among the top three offerors, NGB notified Jacobs on August 7, 2024, that it was not selected for further negotiations. (AR 6391).

Jacobs filed an initial protest with the Government Accountability Office ("GAO") the following week, contesting each rating it received below the highest level. (AR 8234–68). On November 26, 2024, GAO denied all but one of Jacobs's protest grounds and found no competitive prejudice. (AR 10116–38). Specifically, GAO concluded that even with an "Outstanding" rating under Criterion E, Jacobs would not surpass Offeror #3 in overall qualification. (AR 10121–25). This protest followed. (Compl., ECF No. 1).

## II.    Analysis

Jacobs maintains that the Administrative Record reveals a range of shortcomings in NGB's evaluation process. According to Jacobs, NGB overlooked the importance of prioritizing disciplines under Criterion A, failed to conduct a substantive assessment of that criterion, and introduced unspoken factors into the evaluation. (Pl.'s MJAR at 1). Jacobs views the evaluation of its proposal under Criterion A as inconsistent, unreasonable, and disparate. (*Id.*). Jacobs also challenges the fairness of how its proposal was assessed under Criteria D and E. (*Id.*). Furthermore, Jacobs argues that NGB did not follow the Synopsis requirements when ranking offerors and that Jacobs was improperly placed as only the fifth most qualified candidate. (*Id.*). The United States counters that Jacobs's argument merely attempts to supplant the agency's discretion in distinguishing between "Good" and "Outstanding" ratings with its own subjective views. (Def.'s xMJAR at 3). The Court agrees with the United States and concludes that Jacobs has failed to carry its burden to disturb NGB's decision.

### A. Jurisdiction and Standard of Review

The Tucker Act provides that an interested party may file an action in the Court of Federal Claims "objecting [(1)] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [(2)] to a proposed award or [(3)] the award of a contract or [(4)] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 n.18 (2021).[9] According to 28 U.S.C. § 1491(b)(4), the Court typically reviews agency procurement decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Under the APA standard, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013).

Judicial review of agency action under the APA typically proceeds on two tracks; the Court could find: (1) the agency's decision lacked either a rational basis or support from the administrative record or was arbitrary and capricious; and/or (2) the agency's procurement procedure involved a violation of regulation or statute. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). To obtain relief, after showing that the procuring agency violated the law or acted arbitrarily and capriciously, the protester must also show that the agency's violation was prejudicial. *Glenn Def. Marine (ASIA)*, 720 F.3d at 907. This standard is "highly deferential." *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). "Under the 'arbitrary and capricious' standard[,] the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment[.]" *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (internal quotations omitted). The Court may not substitute its own judgment for that of the agency. *Id.* But the agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Even so, a "protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion[.]" *Banknote Corp. of Am., v. United States*, 56 Fed. Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

When reviewing an agency's procurement decisions, the Court is expected to apply a "presumption of regularity" and avoid substituting its own judgment for that of the agency. *See Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018); *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003). Additionally, "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

---

[9] Standing is an integral part of jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). It is not contested in this case. Because of this, and because Jacobs is an incumbent A-E awardee, the Court finds that Jacobs has standing for purposes of this protest.

"For that reason, procurement decisions 'invoke[ ] 'highly deferential' rational basis review.'" *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (citation omitted).

Jacobs and the United States move for judgment on the Administrative Record. *See* RCFC 52.1; (Pl.'s MJAR; Def.'s xMJAR). Unlike the standard applied in summary judgment motions, "the existence of genuine issues of material fact does not preclude judgment on the administrative record" under RCFC 52.1. *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011); *see* RCFC 56. Rather, the Court's inquiry focuses on whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Protection, Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

### B.   Criterion A | Professional Qualifications

Jacobs first takes issue with NGB's evaluation under Criterion A, "Professional Qualifications necessary for satisfactory performance of required services[.]" (Pl.'s MJAR at 6–24). Criterion A is comprised of eleven sub-criteria, each corresponding to a professional discipline, arranged in priority order according to projected workload and their anticipated contribution to project success, (AR 2547). Résumés for these individuals were required to list a minimum of five projects. (*Id.*). The Synopsis further mandated that all engineers and architects possess a "bachelor's degree, professional registration in the role they are assigned in, and at least five years of relevant experience in the role they are assigned in." (*Id.*).

Jacobs received the following ratings for each sub-criterion:

| Criterion A Discipline [10] | Rating | Rating Detail [11] |
|---|---|---|
| (1) Project Manager; NOTE: the Government may give additional consideration for experience managing ANG/ARNG projects | Blue (Outstanding) | ████████████████████████ |

---

[10] The sub-criterion listed herein are recited verbatim from the Synopsis which includes some scrivener's errors. (AR 2546).

[11] The "rating detail" is quoted directly from the Final Evaluation Report. (AR 6317–19).

| | | |
|---|---|---|
| | | |
| (2) Architect;* | Blue (Outstanding) | |
| (3) Civil Engineer;* | Purple (Good) | |
| (4) Structural Engineer;* NOTE: the Government may give additional consideration for seismic retrofit experience | Blue (Outstanding) | |

| | | |
|---|---|---|
| | | ████████████ |
| (5) Mechanical Engineer;* | Purple (Good) | ████████████ |
| (6) Electrical Engineer;* | Purple (Good) | ████████████ |
| (7) Fire Protection Engineer; must have NICET Level IV or FPE*; | Purple (Good) | ████████████ |

| | | |
|---|---|---|
| | | ████████████████ |
| (8) Cost Estimator; must be certified by a professional organization, such as the Association for the Advancement of Cost Engineering (AACE), International Costs Engineering Council (ICEC), or Professional Construction Estimators Association. Certification must be at the professional level. Must have a minimum 8 years industry related experience or 4 years industry related experience + 4-year industry related college degree; | Blue (Outstanding) | ████████████████ |
| (9) Geotechnical Engineer;* | Purple (Good) | ████████████████ |
| (10) Security/Cyber Security Specialist; the security/cyber security specialist(s) must have a bachelor's degree in one of the following: computer science, information science, information systems management, mathematics, statistics, operations research, or engineering; they must have a minimum of five years' of experience in managing cybersecurity of facility-related control systems used to monitor and control equipment and systems related to DoD real property facilities (e.g., building control systems, utility control systems, electronic security systems, and fire and life safety systems. The must also have at least one of the following certifications under IAM Level II . . . | Purple (Good) | ████████████████ |

| (11) Environmental Engineer* or Physical Scientist with experience in NEPA processes specializing in Soil, Sediment, Lead Based Paint (LBP) and Asbestos Containing Material (ACM) Survey and Remediation. NOTE: a Certified Industrial Hygienist or an OSHA Certified Technician with five years of experience may be submitted in lieu of a Professional Engineer. | Purple (Good) |  |
|---|---|---|

(Summarizing AR 2546, 6317–6319).

Jacobs contends that NGB did not appropriately account for the relative importance of each discipline and relied solely on adjectival ratings without further substantive evaluation under Criterion A. (Pl.'s MJAR at 6 (citing *Banknote*, 56 Fed. Cl. at 386 (holding "[i]t is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation" and agencies "may not rely upon undisclosed evaluation criteria in evaluating proposals"))). Jacobs further contends that NGB's evaluation lacked rational consistency and resulted in disparate treatment of its proposal relative to those of higher-rated offerors. (*Id.* at 6–7 (citations omitted)). The Court finds that NGB conducted a reasonable evaluation of the proposals and adequately documented its assessment. No error is identified in NGB's evaluation under Criterion A.

### i. Order of Priority of Individual Disciplines and Tabulation

The Synopsis provides that professional disciplines under Criterion A are arranged in order of precedence, with greater weight assigned to those listed first. (AR 2547 ("Professional disciplines are listed in priority order based on anticipated workload and benefit to project success.")). Jacobs first argues that although the record suggests that NGB placed collective emphasis on the top eight disciplines, the evaluation record does not indicate that NGB assessed the individual weight of each discipline or evaluated them in the priority order required by the Synopsis, based on their expected contribution to project success. (Pl.'s MJAR at 6–7 (citing AR 6236)). "Rather[,] [NGB] merely summed up the number of Outstanding-rated disciplines and did not consider whether or not one Outstanding-rated discipline should be considered more meaningful than another under Criterion A based on priority." (*Id.* at 8 (citing AR 6317, 6254, 6328)). Jacobs believes this "mechanical tabulation" is inconsistent with the terms of the Synopsis. (*Id.*).

The United States challenges Jacobs's assertion and instead urges the Court to find that NGB applied a qualitative evaluation approach, relying on the assigned ratings of each offeror in a manner consistent with the Synopsis. (Def.'s xMJAR at 15). Citing the 146-page Final Selection Report, the United States contends that NGB conducted a comprehensive assessment— sequencing Criterion A through E and their respective sub-criteria. (*Id.* (citing AR 6237–6382)). To further support its position, the United States cites post-hoc declarations from the contracting

officer and board chair to justify Jacobs's "Good" rating under Criterion A.[12] (*Id.* at 17). The contracting officer explained that each discipline was assessed based on qualifications rather than individual résumés, and while Jacobs's proposal exceeded requirements, it did not do so significantly. (*Id.* (citing AR 8808–09)). As the United States characterizes it, the board chair added that the rating was not determined by tallying scores, noting Jacobs received seven "Good" and four "Outstanding" sub-criteria ratings, emphasizing that no discipline dominated in importance and the mixed results did not support an upgrade to "Outstanding." (*Id.* (citing AR 8816)).

Ultimately, the Court disagrees with Jacobs's proposition that a proper sequencing of disciplines by NGB, in accordance with the stated prioritization, would have warranted an "Outstanding" rating under Criterion A. While the Synopsis indicated that disciplines were listed by relative importance with a focus on the top eight disciplines, it did not provide a specific weighting scheme. (*See* AR 2547). In such cases, the Court affords deference to the agency's interpretation and evaluative methodology, particularly where the procurement's framework lacks prescribed metrics. *CHE Consulting*, 552 F.3d at 1354. Consequently, the argument that Jacobs would have received a higher rating had NGB assigned concrete weight to the sub-criteria is speculative and unsupported by the record.

The Court therefore relies on the evaluation criteria NGB employed. According to the Synopsis, Criterion A was evaluated as follows:

> Evaluation of each discipline will consider education, registration, demonstrated experience, certifications, and longevity with the firm. Evaluation will be based on an assessment by the board of the firm's ability to effectively address the professional qualifications as described above. A firm that provides resumes for key personnel with greater levels of discipline specific education, experience, and certifications as well as longevity with the firm will be considered more highly qualified than one that provides less qualified personnel, with less discipline specific education and experience as well as a shorter duration with the firm. Professional disciplines are listed in priority order based on anticipated workload and benefit to project success.

---

[12] These documents are part of the Administrative Record based on the record before the GAO. (AR 10130 (citing AR 8810, AR 8816–19)). Except in limited circumstances, courts generally deem post hoc declarations inadmissible when evaluating claims based solely on the administrative record. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1908–09 (2020) (directing that "judicial review of agency action is limited to the grounds that the agency invoked when it took the action" and concluding that "[a]n agency must defend its actions based on the reasons it gave when it acted," while post hoc rationalizations for agency action are "impermissible" (internal quotations omitted)); *see Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 277 (2024). As the Court determines that the record supports a reasonable inference regarding Jacobs's rating under this criterion, it finds no need to consider the submitted declarations.

(AR 2547). The information relayed in the chart above evinces that the Final Selection Board took each of the relevant factors into account when assigning an adjectival rating. (AR 6317–19). The details NGB lists for each rating consider each proposed individual's level of education, certifications, tenure at the firm, and project experience. This is exactly what the Synopsis dictates.

However, Jacobs also takes issue with the methodology underlying these calculations, referring to it as a "mechanical tabulation" not warranted by the Synopsis. (Pl.'s MJAR at 8). A harsh truth of government procurements is that numerical factors inevitably play a role due to the structured nature of evaluation protocols. While the evaluation may have employed a numerical scoring methodology when determining adjectival ratings, such an approach does not contravene the terms of the Synopsis. Although Jacobs may view this methodology as being mechanically tabulated, the Synopsis expressly provides that qualifications will be assessed and weighted according to discipline-specific factors and prioritized by anticipated workload and project relevance. Thus, the evaluator's assigned scores based on personnel résumés was *consistent* with the Synopsis's stated criteria and further demonstrates that the evaluation process reflected the required considerations. Accordingly, even if the scores were "mechanically applied," the resulting scores are consistent with the Synopsis and demonstrate that NGB considered the appropriate factors in its assessment.

ii.   Failure to Make Qualitative Analysis

A recurring theme in Jacobs's briefing, like its objection to NGB's tabulation method, is that NGB evaluators employed a mechanical rating approach without conducting the required qualitative assessment. (Pl.'s MJAR at 10). In other words, Jacobs contends that NGB's methodology treated offerors as figures on a score sheet, rather than as professional entities with distinct capabilities. In support of this argument, Jacobs points to the Evaluation Summary Table, which it claims reflects a superficial emphasis on the numerical distribution of ratings, particularly in the top eight disciplines designated as priority areas. (*Id.* (citing AR 6236)). According to Jacobs, the discipline-level assessments consist primarily of checkbox-style lists describing résumé attributes and do not document comparative or qualitative discussion of the résumés' relative strength or merit. (*Id.* (citing AR 6317–20; 6254–56; 6241–43; 6329–30)). Jacobs argues that the lack of deeper reasoning reflects a departure from the criteria prescribed in the Synopsis and materially undermines Jacobs's rating and competitiveness. (*Id.*). This argument gives short shrift to the agency's evaluation; Jacobs's characterization of NGB's analysis as solely quantitative fails to account for the qualitative assessment it also generated.

In government contracting, qualitative and quantitative analyses represent two complementary methods for evaluating the merits of proposals. *See Myriddian, LLC v. United States*, 168 Fed. Cl. 353, 359 (2023) (discussing significance of source selection authority's comparison of qualitative and quantitative assessments). That said, the methodologies tend to overlap in practice to provide a holistic picture of a proposal's merits. The interplay between qualitative and quantitative factors is inherent in all rating and balancing assessments, with each informing and reinforcing the other. *See e.g., TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327–28 (Fed. Cir. 1996) (stating that source selection authority may consider both quantitative and qualitative factors); *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1302 (Fed. Cir. 2015) (finding evidence of qualitative assessments unreasonable

when they are not anchored to a quantitative valuation for apportionment principles in patent law); *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1289 (Fed. Cir. 2004) (discussion of quantitative ratios being used as part of overall qualitative analysis in a non-contracting context). Stated differently, numbers give shape to a narrative, while the narrative gives meaning to the numbers. For instance, an evaluator might assess the adequacy of a project schedule qualitatively, but that assessment is grounded in the measurable duration of tasks or resource allocation. Similarly, and relevant here, the strength of proposed personnel may be judged based on degrees held, years of experience, or specific certifications. These aspects are clearly quantitative in nature but ultimately inform a qualitative assessment.

It must be true that, to be effective, evaluations should rely on the relationship between quantitative and qualitative assessments to ensure that decisions are rational and balance data-driven objectivity with informed professional judgment. *See AcmeSolv, LLC v. United States*, 174 Fed. Cl. 748, 756 (2025) (finding that quantitative analysis informed overall confidence rating). In this case, the record reflects that the NGB's evaluators reviewed proposed personnel credentials using a structured framework that included both quantitative benchmarks and discipline-specific assessments. (*See* AR Tab 114). Although the Evaluation Summary Table organized adjectival ratings by discipline and priority level, that format does not, on its own, establish that the evaluators failed to conduct the substantive analysis required under the Synopsis. The record contains narrative annotations and résumé-specific evaluations addressing qualifications cited in the Synopsis, including education, experience, certifications, and tenure. Although concise, the assessments do not constitute procedural error. (AR 9957–10101).

FAR Subpart 36.6 allows for professional judgment without exhaustive justification, provided the methodology remains transparent and internally consistent. That Jacobs disagrees with the depth of analysis NGB implemented does not engage with this Court's standard of review. As the Federal Circuit has recognized, challenges to the technical scoring involve the "minutiae of the procurement process," "discretionary determinations of procurement officials that a court will not second guess." *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1384 (Fed. Cir. 2012) (quotation marks omitted) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (citations omitted)). Agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 959 (Fed. Cir. 1993) (quoting *Tidewater Mgmt. Servs., Inc. v. United States*, 216 Ct. Cl. 69, 83, 573 F.2d 65 (1978)). Accordingly, the Court concludes that NGB's approach to evaluating Criterion A was consistent with the Synopsis, compliant with FAR 36.602-3, and within the bounds of reasonable discretion. Jacobs has not demonstrated that the evaluation was arbitrary, capricious, or procedurally defective.

iii.  Evaluation of Criterion B Participation by Criterion A Disciplines

Jacobs contends that NGB's evaluation under Criterion A was procedurally flawed and inconsistent with the express terms of the Synopsis. (Pl.'s MJAR at 10). Contrary to the Synopsis, Jacobs argues that NGB improperly focused on the number of projects associated with each labor discipline, referencing information submitted under Primary Criterion B. (Pl.'s MJAR at 10–12 (citing AR 6240–42; 6241–43; 6254–56; 6329–30)). Criterion B was specific to "Specialized Experience and Technical Competence in the type of work required, including, as appropriate, experience in sustainable design, energy conservation, pollution prevention, waste

reduction, and the use of recovered materials[.]" (AR 2547). As Jacobs sees it, this cross-criterion analysis constitutes the application of unstated evaluation criteria because the Synopsis did not require that personnel have experience with specific projects, nor did it indicate that such experience would be weighted more favorably. (*Id.* at 11). The United States contends that Jacobs's allegation is unsupported by the record. (Def.'s xMJAR at 18). Citing the previous GAO decision, it argues that NGB's correlation of personnel between Criteria A and B did not affect the rating assigned under Criterion A. (*Id.* (citing AR 10130–31)). The Court agrees that Jacobs's argument is without merit.

It is well established that an agency cannot evaluate proposals on unstated criteria. *See Banknote*, 56 Fed. Cl. at 386 (stating that "agencies must evaluate proposals and make awards based on the criteria stated in the solicitation"). To prevail on a claim that an agency improperly utilized unstated evaluation criteria, a plaintiff must demonstrate that: (1) "the procuring agency used a significantly different basis in evaluating the proposals than was disclosed;" and (2) "the protester was prejudiced as a result—that it had a substantial chance to receive the contract award but for that error." *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 48 (2009) (quoting *Banknote*, 56 Fed. Cl. at 387). Jacobs fails on both elements.

First, Jacobs suggests a significant reliance on the correlation of projects submitted under Criterion B. The relationship between Criteria A and B is mentioned for some individual disciplines, but it is not stated as a basis for a rating. However, even if NGB did cross-reference Criterion A personnel with Criterion B projects, the Court finds that it would not matter and could not cause prejudicial error. Courts have found that while agencies may not consider unstated criteria per se, "a solicitation need not identify criteria intrinsic to the stated evaluation factors, and agencies retain great discretion in determining the scope of a given evaluation factor." *Summit Techs., LLC v. United States*, 151 Fed. Cl. 171, 180 (2020) (quoting *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536 (2010)); *see Sys. Implementers, Inc. v. United States*, 162 Fed. Cl. 754, 769 (2022). It is nonsensical, and there is no case law to support the proposition, that agencies cannot account for the interaction of factors across a solicitation. The Synopsis required that ratings of "Good" and "Outstanding" reflect proposals that exceeded qualification requirements, emphasizing discipline-specific education, *experience*, certifications, and longevity with the firm. (AR 2547, 2551). The Synopsis specifies that experience is considered, though it does not detail to what capacity. Because Criterion B relates to experience, it cannot be said that NGB relied on unstated criteria when considering relevance to Criterion A.

### iv.    Internal Consistency

Jacobs also argues that if Criterion B was properly considered, it renders NGB's Criterion A evaluation internally inconsistent. (Pl.'s MJAR at 12–24). Jacobs first supports this argument iterating that it received an "Outstanding" rating under Criterion B for its proposed projects, therefore it should have also received an "Outstanding" rating on Criterion A due to employing personnel involved with Criterion B projects. (*Id.* (citing AR 6319; AR 6237–82)). The Court is not convinced. This argument fails to consider extraneous factors such as the personnel's level of involvement in the prior project, the overall success of the project, and other external factors that may affect how experience is considered when assessing a rating. The Court interprets Jacobs's argument as a disagreement with NGB's evaluation process—the minutiae of procurement. The Court will not intervene in such matters unless there is evidence that NGB's actions were

arbitrary or capricious. *Mortg. Contracting Servs. v. United States*, 153 Fed. Cl. 89, 126 (2021) ("The court must especially defer to the agency's technical evaluations, past performance ratings, and other minutiae of the procurement process . . . which involve discretionary determinations of procurement officials." (internal quotation marks and citations omitted)).

This Court consistently recognizes that contracting officers enjoy "broad discretion with respect to evaluation of technical proposals[,]" and the Court typically does not "second guess the technical ratings that the source selection committee gave to each offeror." *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 104 (2006) (quoting *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002)). Even so, the Court has cautioned that "unsuccessful offerors repeatedly ignore this." *AccelGov, LLC v. United States*, 170 Fed. Cl. 508, 518 (2024). "The goal of bid protests is to ensure fairness and transparency in the procurement process, not to provide a forum for bidders to challenge every minor disagreement with an agency's evaluation." *Warrior Focused Sols., LLC v. United States*, 175 Fed. Cl. 416, 427 (2025). These restrictions enhance efficiency while ensuring a clear separation between the judiciary and routine government contracting oversight. As a result, agencies maintain broad discretion in defining the scope of an evaluation factor. *See Summit Techs.*, 151 Fed. Cl. at 180; *PlanetSpace*, 92 Fed. Cl. at 536. As the disappointed offeror, Jacobs bears the heavy burden of showing that NGB's evaluation lacked a rational basis. *See Galen Med. Assocs.*, 369 F.3d at 1330 (addressing burden of proof in negotiated procurements). "[T]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, . . . and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (internal quotation marks and citations omitted). Although Jacobs broadly invites the Court to improperly second-guess NGB's evaluation, the Court declines to do so. Nevertheless, it analyzes Jacobs's arguments solely to assess whether the decisions were reasonable.

Jacobs's more specific arguments relate to positions ultimately evaluated as "Good" but were overshadowed and filled with personnel that had prior experience with Criterion B projects—its Civil, Mechanical, Electrical, and Geotechnical engineers as well as its Fire Protection of Engineer and Security/Cyber Security Specialist. (Pl.'s MJAR at 14). Each of these personnel were in the top eight positions that NGB deemed to be "heavy hitters," so to speak. According to the protest, Jacobs's personnel possessed superior discipline-specific education, experience, certifications, and tenure with the firm, yet received "Good" ratings while other offerors with comparable or lesser qualifications were rated "Outstanding." (*Id.* at 15–17). Jacobs contends that NGP failed to adequately document or properly assess whether Jacobs's proposed personnel exceeded the required qualifications, instead relying on superficial summaries. (*Id.* at 16). For Jacobs, this alleged failure resulted in unfair and disparate treatment across several disciplines and violated the terms of the Synopsis. (*Id.*).

As to its proposed civil engineers, Jacobs believes NGB failed to properly evaluate them by disregarding the extent to which their qualifications exceeded the Synopsis's criteria. (Pl.'s MJAR at 16). Despite Jacobs's team demonstrating substantial experience, it believes that NGB rated them "Good" without adequately weighing these strengths. (*Id.*). In contrast, Offeror #1's Civil Engineers, possessing nearly identical qualifications and slightly more firm tenure, were rated "Outstanding," suggesting disparate treatment. (*Id.* at 17 (citing AR 6318, 6236, 8816–17)).

The Court finds this unavailing because, although the proposed engineers demonstrated substantial experience and firm tenure, NGB concluded that their education and registrations/certifications merely satisfied—but did not notably surpass—the requirements set forth in the Synopsis. This is squarely within their discretion. *See Info. Scis. Corp.*, 73 Fed. Cl. at 104. Additionally, the United States notes that Jacobs's claim that Offeror #1 received an "Outstanding" rating is incorrect; Offeror #1's Civil Engineers were also rated "Good." (Def.'s xMJAR at 20 (citing AR 6318, 6254–55)). Accordingly, Jacobs's disparate treatment argument fails.

Jacobs contends that its proposed Mechanical Engineers significantly exceeded the Synopsis requirements, with thirty-eight and eighteen years of experience, including over fifteen years at the firm and several years of NGB-specific work. (Pl.'s MJAR at 18 (citing AR 4132, 4149–50, 2546)). Jacobs argues these qualifications warranted a higher rating and that NGB's failure to holistically evaluate these strengths was inconsistent with the Synopsis's stated criteria. However, as the United States points out, Jacobs only focuses on levels of experience and longevity with the firm but fails to account for levels of discipline-specific education, registrations, and certifications sufficient to receive an "Outstanding" rating. (Def.'s xMJAR at 20; *see* AR 6318, 6236, 8817).

Jacobs goes on to argue that NGB failed to properly evaluate its proposed Electrical Engineers by disregarding extensive qualifications, including a combined sixty-three years of experience, over fifteen years with the firm, substantial NGB-specific experience, and LEED certification. (Pl.'s MJAR at 19 (citing AR 4132, 4151–52, 8817)). As Jacobs puts it, NGB focused narrowly on education and failed to assess supplemental factors. (*Id.*). Jacobs contends that such an evaluation was disparate, as Offeror #2's Electrical Engineers were rated "Outstanding" with fewer years of experience and less tenure while Jacobs's personnel were rated "Good." (*Id.* at 19–20 (citing AR 2819–22, 6242, 6318)). Again, there is nothing in the record that supports this theory. As the United States notes, educational qualifications contributed to Offeror #2's higher rating, as one of its proposed Electrical Engineers held a master's degree, whereas Jacobs's proposed engineers held only bachelor's degrees. (Def.'s xMJAR at 21 (citing AR 6242, 6318, 8817)). Educational qualifications significantly influence outcomes in the procurement process. Accordingly, Jacobs has not shown that these ratings were unreasonable.

As to Jacobs's Fire Protection Engineers, Jacobs insists that the evaluation did not show how Jacobs's team exceeded the Synopsis's five-year relevant experience requirement, nor did it address the significance of their tenure or certifications, despite their qualifications. (Pl.'s MJAR at 20). However, agencies are not obligated to explain unless the presumption of regularity is challenged by evidence indicating the decision was arbitrary or capricious. *Impresa Construzioni*, 238 F.3d at 1338. The record reflects that Jacobs's Fire Protection Engineers were acknowledged for their experience, firm tenure, and certifications. (AR 6318, 6236, 8818). However, NGB determined these qualifications did not justify an "Outstanding" rating, as the collective résumés failed to exceed the standards for discipline-specific education or certification. Without additional evidence, it cannot be said that this finding was not arbitrary or capricious.

Jacobs characterizes NGB's evaluation of its proposed Geotechnical Engineer as arbitrary and based on undefined, post-hoc criteria. (Pl.'s MJAR at 20–23). According to Jacobs, NGB improperly invoked an "industry standard" not included in the Synopsis, which only required professional registration. (*Id.* at 21). Jacobs argues NGB failed to support this standard with objective references and instead relied on vague, informal interpretations. (*Id.*). Jacobs maintains that its candidate—who holds multiple registrations, specialized software training, a master's degree in Geotechnical Engineering, and twenty-eight years of experience—exceeded the Synopsis requirements. (*Id.*). Nevertheless, Jacobs asserts NGB rated its engineer as merely "Good" while awarding an "Outstanding" rating to a similarly qualified competitor. (*Id.* at 22). Further, Jacobs argues its Environmental Engineer was rated lower than an equally qualified candidate from Offeror #1, despite similar experience, education, and certifications. (*Id.* at 24).

Jacobs's disparate treatment claims concerning its Geotechnical and Environmental Engineer proposals do not meet the threshold of substantial indistinguishability required to support such claims. It is not unreasonable for agencies to evaluate differing proposals differently. *Allicent Tech., LLC v. United States*, 166 Fed. Cl. 77, 110 (2023); *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020). Jacobs contends that its Geotechnical Engineer's qualifications were comparable to Offeror #1's, yet the record shows the latter held professional registrations in twice as many states, which would be desirable in a multi-region contract. (AR 3043, 4156). NGB reasonably concluded this distinction warranted differing ratings. (*See* AR 8108). Per *E.W. Bliss*, such discretionary judgments are not for courts to second-guess. 77 F.3d at 449. Likewise, for the Environmental Engineer discipline, Jacobs's candidate held limited certifications compared to Offeror #1's proposed candidate, whose team included an Industrial Hygienist certified in four states. (AR 3045, 4159). The Court finds that the record supports NGB's rating decision, and that Jacobs fails to show the proposals were substantially indistinguishable. (AR 8819–20).

Finally, Jacobs contends that its Security/Cyber Security Specialist was underrated despite exceeding Synopsis requirements, citing seventeen years of experience, advanced certifications, and a relevant degree. (Pl.'s MJAR at 23 (citing AR 4133, 4157)). Jacobs argues NGB overlooked key qualifications, focusing narrowly on education and firm tenure, which it claims violates the Synopsis's evaluation criteria. (*Id.*). This challenge does not render the agency's assessment unreasonable. The Court agrees with the United States; "[t]he record supports the NGB's estimation that the education level and longevity with the firm for this discipline on balance with the other three factors (demonstrated experience, registration, and certifications) did not merit rating Jacobs an overall [O]utstanding . . . rating." (Def.'s xMJAR at 21 (citing AR 6318–19, 6236, 8818–19)).

The Synopsis was clear that each of the personnel were required to have "a bachelor's degree, professional registration in the role they are assigned in, and at least five years of relevant experience in the role they are assigned in [and] [e]valuation of each discipline will consider education, registration, demonstrated experience, certifications, and longevity with the firm." (AR 2547). Furthermore, "key personnel with greater levels of discipline specific education, experience, and certifications as well as longevity with the firm will be considered more highly qualified than one that provides less qualified personnel." (*Id.*). The Court finds that

NGB's evaluation of these seven disciplines was reasonable, consistent with the Synopsis, and supported by the Administrative Record.

As its final, wide-ranging shot at Criterion A, Jacobs contends that NGB's evaluation was internally inconsistent and arbitrarily applied across disciplines. (Pl.'s MJAR at 24–25). Despite the Synopsis requiring evaluators to consider discipline-specific qualifications such as education, experience, certifications, and longevity, Jacobs asserts that personnel with comparable or superior credentials were rated "Good" while others with lesser qualifications received "Outstanding" ratings. (*Id.* at 24). Jacobs states that several "Good"-rated individuals demonstrated well beyond the minimum required experience—ranging from twenty to over forty-five years—while an "Outstanding"-rated Cost Estimator had seventeen years of experience. (*Id.* (citing AR 6236)). Similarly, disciplines with master's degrees were rated "Good," while Project Managers with bachelor's degrees received "Outstanding" ratings. (*Id.*). Jacobs argues this inconsistency undermines the objectivity of NGB's evaluation and results in a disparate assignment of strengths. (*Id.* at 24–25). However, NGB was not required to do a side-by-side comparison for the résumés and each of the cited instances have other differences within experience, certification, etc. Individual assessments must account for the entirety of a person's qualifications and characteristics, which naturally results in varied evaluations. Jacobs has not carried its burden to show that NGB arbitrarily or capriciously evaluated Criterion A.

### C.  Criterion D | Past Performance

Next, Jacobs argues that NGB's assignment of weaknesses under Primary Criterion D was unreasonable and contrary to the Synopsis's requirement that only credible, documented, and recent past performance information be considered. (Pl.'s MJAR 25–28 (citing AR 2549)). Specifically, Jacobs challenges NGB's reliance on three "Marginal" Contractor Performance Assessment Reporting System ("CPARS") ratings—each reflecting either temporal staleness or resolved deficiencies.[13] (*Id.* at 25). The United States contends that the three marginal ratings in question had no impact on Jacobs's evaluation; NGB excluded them, resulting in a "Satisfactory Confidence" rating based on stronger performance across other projects. (Def.'s xMJAR at 23). It further argues that since all top offerors received the same rating under a less significant criterion, Jacobs cannot show competitive prejudice. (*Id.*). The United States is correct; Jacobs's Criterion D challenge fails because the NGB excluded the marginal ratings and applied a consistent confidence assessment across top offerors.

The Synopsis required offerors to submit past performance information, including reference contact details; it permitted the inclusion of supplemental materials such as client commendations, descriptions of prior issues, and corrective actions taken in response to any unfavorable CPARS evaluations. (AR 2549). In return, the evaluation board would assess offerors' past performance—drawing from CPARS and other sources—based on quality, cost control, and timeliness, with consideration limited to credible, recent, and relevant information,

---

[13] CPARS refers to a web-based platform used to collect, evaluate, and manage contractor performance data for government contracts and agreements. Contractor Performance Assessment Reporting System, https://www.cpars.gov/cparsweb/home [https://perma.cc/B3R5-E57Z] (last visited July 20, 2025).

while neutral treatment would apply to offerors lacking such data. (*Id.*). The Synopsis specifically states that "[c]redible, documented information on past performance will be considered, except for adverse performance information to which the firm has not had an opportunity to respond." (*Id.*).

In evaluating Criterion D, Jacobs contends that NGB's reliance on three isolated "Marginal" CPARS ratings was procedurally flawed in light of the Synopsis's directive to rely on recent and credible past performance data.[14] (Pl.'s MJAR at 25). Jacobs emphasizes that each of the cited ratings was either stale or superseded, including one that was approximately six years old, another from five years prior, and a third that had since been upgraded to "Very Good." (*Id.* at 26–27). Further, Jacobs contends that these CPARS ratings represented only a fraction of the 1,199 evaluation factors available, while Jacobs consistently received "Very Good" or "Exceptional" ratings in more than half of the total record. (*Id.* at 27). In Jacobs's view, assigning a lower confidence rating based on such outliers ignores its long-standing pattern of successful performance and imposes an unwarranted penalty. (*Id.*).

The United States responds that Jacobs's objections were previously rejected at the GAO and that this Court should follow suit. (Def.'s xMJAR at 23 (citing AR 10134, 6327)). The United States further contends that the three identified ratings were not negatively weighted in NGB's evaluation, as shown by the Final Selection Report's deliberate exclusion of those ratings from consideration. (*Id.* at 24). Moreover, the United States asserts that the bulk of Jacobs's performance ratings were satisfactory or better, and when combined with the ten projects submitted in its proposal, NGB reasonably assigned a "Satisfactory Confidence" rating based on the aggregate data. (*Id.*).

As an initial point, the Court owes no deference to GAO determinations and affords it none here. *See Assessment & Training Sols. Consulting Corp. v. United States*, 173 Fed. Cl. 123, 127 (2024) ("The GAO's earlier decision in this procurement is not binding on this Court."); *Scott Techs., Inc. v. United States*, 168 Fed. Cl. 705, 714 n.5 (2023) ("The Court is not bound by GAO decisions, and it follows that the parties are not bound to arguments advanced before the GAO either."); *VS2, LLC v. United States*, 155 Fed. Cl. 738, 766 (2021) ("Federal Circuit precedent does not require that this Court simply defer to GAO's decision . . . or the Agency's reliance upon it."). Based on the record before it, the Court finds in favor of the United States. The evaluation confirms that the three "Marginal" ratings were not adversely weighted in the evaluative process. The evaluation board compiled the Criterion D ratings in the following chart:

---

[14] The first rating, associated with the ███████████████, is nearly six years old and represents the only "Marginal" Cost Control rating among 288 reviewed contracts. (AR 6327, 6362). Similarly, the second "Marginal" rating, from the ███████████████, is five years old and the sole "Marginal" Management rating in the dataset. (AR 6326, 6327). The third rating, from the ███████████████████, was issued during an interim evaluation but later upgraded to "Very Good" in subsequent reporting. (AR 6326).



(AR 6327). The Final Selection Report and associated documentation reflect that NGB deliberately determined to exclude those ratings from consideration and instead relied on a broader record—including 288 CPARS entries and ten proposal projects—to assign a "Satisfactory Confidence" to Jacobs. (*Id.*). This approach aligns with the Synopsis's directive to consider credible and recent performance data and reflects a reasoned judgment within the agency's discretion. (*See* AR 2549). Given this, the Court concludes that NGB's evaluation methodology was procedurally sound, not arbitrary or capricious, and consistent with applicable procurement regulations.

### D.  Criterion E | Location

Jacobs argues that NGB improperly rated its proposal under Criterion E by ignoring the ranked importance of sub-criteria. (Pl.'s MJAR at 28–29). Despite receiving top ratings on the most critical elements, its overall score was lowered, allegedly distorting the evaluation framework and harming its competitive standing. (*Id.* at 28). The United States counters that the Board used a qualitative, holistic review—not weighted averages—and that Jacobs suffered no prejudice even if a rating error occurred. (Def.'s xMJAR at 25–26). The Court agrees that even if NGB incorrectly evaluated Criterion E, it would have resulted in a race for fourth place. Because there were only three crowns, Jacobs was not competitively prejudiced by the evaluation outcome.

All contract work was to be performed across the lower forty-eight states, the District of Columbia, and the Territory of Guam. (AR 2549–50). Offerors were meant to describe and demonstrate the team's familiarity with design requirements applicable to these locations. (AR 2549). The three sub-criteria included:

> (1) In SF330 Part I, Section H, describe and demonstrate the team's familiarity with design requirements applicable to these locations.
>
> (2) Submit information addressing your methodology for obtaining knowledge of hydrology, soil conditions, seismic conditions, weather conditions, state/local building codes, and construction industry standards.
>
> (3) Describe measures you take to adapt standard design details to local industry/construction trades standard practice.

(AR 2550). Evaluation would focus on how effectively the firm and its key sub-consultants demonstrate knowledge of locality; those who did so more convincingly would be rated more highly. (*Id.*).

Jacobs contends that NGB failed to reasonably evaluate its submission under Primary Criterion E by disregarding the prioritized structure of the sub-criteria. (Pl.'s MJAR at 28). According to Jacobs, its proposal received "Outstanding" ratings for the top two most heavily weighted sub-criteria, and only a "Good" rating for the least important third sub-criterion. (*Id.* (citing AR 6236)). Yet, NGB assigned Jacobs an overall rating of "Good" for Criterion E without accounting for the relative significance of each component. (*See* AR 6236). Jacobs maintains that this approach undermines the evaluative framework outlined in the Synopsis, which expressly ranked sub-criteria in descending order of importance. (Pl.'s MJAR at 28). The procedural error, Jacobs argues, led to an inaccurate overall rating and unfairly diminished the qualitative strengths of its proposal, which prejudiced its standing in a highly competitive field. (*Id.* at 29).

The United States responds that Jacobs's position mischaracterizes the evaluation methodology employed by the Final Selection Board. (Def.'s xMJAR at 25). While the sub-criteria were considered in assigning ratings, the United States argues that the Board did not apply a mathematical weighting or averaging scheme. (*Id.*). The government also purports that, even if NGB erred in assigning a lower rating, Jacobs suffered no competitive prejudice. (*Id.* at 26 (citing AR 10123–24)).

Notably, Jacobs won this battle at GAO but ultimately lost the war. GAO found that NGB did not evaluate Criterion E in accordance with the priority assigned in the Synopsis. (AR 10122). Despite this error, GAO concluded that Jacobs suffered no competitive prejudice, citing NGB's assertion that an improved adjectival rating under Criterion E would not have altered Jacobs's overall ranking. (AR 10124). Jacobs disputes GAO's findings, emphasizing that the Synopsis prioritized qualitative strengths over adjectival scores, and that the margin between the third, fourth, and fifth-ranked offerors was narrow. (Pl.'s MJAR at 28). Jacobs maintains that, had its strengths been properly considered under Criterion E, its proposal would have been more favorably rated and included among those selected for negotiation. (*Id.* at 28–29).

The Court notes a striking reversal in the parties' interpretive stances regarding Criterion E. Throughout the broader dispute, Jacobs consistently advocated for a holistic review of proposals while the United States emphasized strict adherence to the weighted structure of evaluation criteria. Yet when addressing Criterion E, their positions invert—Jacobs now insists

on a weighted assessment aligned with sub-criteria rankings, while the government advocates for a holistic judgment. At any rate, the Court finds no need to assess NGB's methodology because Jacobs cannot establish competitive prejudice. Such positional inconsistency is, nevertheless, always troubling.

Even if Jacobs had received an "Outstanding" rating under Criterion E, it cannot establish that the overall ranking would have changed. Jacobs was ranked fifth overall, with only the top three firms selected for price negotiations. (AR 6380). Criterion A was designated the most important evaluation factor, and Jacobs did not establish error or prejudice in that area. Both Jacobs and Offeror #3 received "Good" ratings under Criterion A, but Offeror #3 had five sub-criteria rated as "Outstanding" compared to Jacobs's four. (*Compare* AR 6317–19 *with* AR 6328–30). Jacobs was not rated higher on any shared discipline, and Offeror #3 additionally received an "Outstanding" rating for fire protection engineering (*Compare* AR 6317–19 *with* AR 6328–30). Both firms had equal overall ratings for Criteria B, C, and D. (*Compare* AR 6319–27 *with* AR 6330–41). Offeror #3 earned "Outstanding" marks across Criterion E and all sub-criteria. (*Compare* AR 6327–28 *with* AR 6341–42). Even if Jacobs had received an "Outstanding" under Criterion E, Offeror #3's superior performance under Criterion A would have made its proposal stronger overall (*See* AR 6317–42). A revision to Jacobs's rating under Criterion E could potentially move the firm into fourth position; however, only the top three are eligible for award consideration. Because Jacobs fails to demonstrate that any error under Criterion E materially affected its competitive standing, the Court concludes that it cannot be a basis for disturbing NGB's decision.

### E.    Ranking

Jacobs contends that NGB unreasonably ranked it as the fifth most qualified offeror, despite being equally qualified with third-place Offeror #3 under the most important evaluation factor, Criterion A. (Pl.'s MJAR at 33–34). Jacobs further argues that its proposal was demonstrably stronger than Offeror #3's under Criterion B, the second most important criterion, and that these comparative strengths warranted a higher ranking. (*Id.* at 34–36). The United States argues that the Final Selection Report met all regulatory requirements prescribed by the FAR. (Def.'s xMJAR at 26–34). The Court agrees with the United States and finds that NGB did not violate the terms of the Synopsis or FAR 36.6.

Jacobs argues that NGB failed to comply with FAR 36.602-3(d) and the evaluation framework in the Synopsis by ranking offerors based solely on adjectival ratings without conducting a meaningful qualitative comparison of proposed personnel. (Pl.'s MJAR at 29–30). Jacobs emphasizes that the Synopsis required evaluators to consider which firms provided résumés demonstrating "greater levels" of discipline-specific education, experience, certifications, and longevity with the firm—particularly in higher-priority disciplines. (*Id.*). According to Jacobs, NGB overlooked these substantive qualifications and instead mechanically counted the number of disciplines that received "Outstanding" ratings, without assessing the relative strength or priority of those ratings. (*Id.*). Jacobs asserts that this method failed to distinguish between firms with similarly rated personnel and deprived its proposal of recognition as one of the most highly qualified, thereby prejudicing its competitive standing. (*Id.* at 30–31).

The United States counters that Jacobs's prescribed methodology is not required by FAR Subpart 36.6 or the Synopsis. (Def.'s xMJAR at 30–31). The United States argues that the Final Selection Report met all regulatory requirements by recommending the three most highly qualified firms and explaining the basis for the rankings through documented strengths and ratings. (*Id.*). According to the government, the Synopsis never required exhaustive textual comparisons across offerors, and any challenge to that omission should have been made before the close of bidding. (*Id.* at 32). The United States asserts that NGB's ranking was procedurally sound, reflecting internal consistency, discipline priorities, and qualitative strengths, while Jacobs's interpretation introduces evaluative obligations unsupported by law or regulation. (*Id.* at 31–33).

Jacobs has not demonstrated that the rankings, ratings, or documented strengths were inconsistent or inadequately explained. Nor has it shown that the Synopsis required the level of comparative rigor it now demands.[15] Unlike FAR Part 15's best value procedures, the architect-engineer selection process under FAR 36.6 calls for a ranking of the most highly qualified firms based on professional qualifications and narrative justification, not a granular comparative analysis of every résumé and sub-criterion. The Final Selection Report complied with FAR 36.602-3(d) by recommending the most highly qualified firms and providing a rationale for those rankings. (AR 6237–82). Based on the record and the governing legal framework, the Court finds in favor of the United States. Jacobs's proposed methodology entails exhaustive textual comparisons across all disciplines and evaluation factors and is not required by the FAR or the Synopsis. The Court concludes that NGB's evaluation methodology and ranking system were reasonable, aligned with FAR 36.6 and the Synopsis, and not arbitrary, capricious, or contrary to law.

As it applies to Jacobs's comparison to Offeror #3, Jacobs and the United States present fundamentally divergent interpretations of how the evaluation and ranking process should have been conducted under Primary Criteria A and B. (Pl.'s MJAR at 32–37; Def.'s xMJAR at 33–34). Jacobs contends that, even assuming no procedural flaws elsewhere, its proposal was demonstrably superior to Offeror #3's and deserved a higher ranking. (Pl.'s MJAR at 32–37). Under Criterion A, Jacobs and Offeror #3 received nearly identical adjectival ratings, differing only in the Fire Protection Engineer discipline. (*Id.* at 33). Jacobs argues that when considering the substance of the résumés, particularly for top priority roles, it offered personnel with higher levels of education, experience, certifications, and tenure. (*Id.*). It maintains that NGB was required under the Synopsis to perform a qualitative comparison of these underlying credentials and prioritize strengths according to discipline importance. (*Id.* at 34). Further, under Criterion B, Jacobs asserts its proposal outperformed Offeror #3's by receiving two more "Outstanding" ratings and submitting more relevant project experience in key sub-criteria. (*Id.* at 35–36). Jacobs

---

[15] Because it finds no error in NGB's evaluation/ranking process, the Court does not analyze whether Jacobs waived its argument by failing to challenge the terms of the Synopsis. However, insomuch as Jacobs found the evaluation framework insufficient, its remedy likely would have been to challenge the terms of the Synopsis before the close of bidding.

concludes that, taken together, its superiority in the most critical disciplines and sub-criteria warranted a higher overall ranking than Offeror #3. (*Id.* at 36–37).

The United States responds that Jacobs's argument hinges on a subjective reassessment of the proposals and misreads both the Synopsis and the regulatory framework under FAR Subpart 36.6. (Def.'s xMJAR at 33–34). The government emphasizes that NGB's technical experts applied consistent evaluative standards and that Offeror #3's proposal reasonably demonstrated strengths—such as more certifications and recent project experience—that justified its ranking. (*Id.* at 33). The United States also rebuts Jacobs's emphasis on Criterion B, noting that Criterion A was accorded greater weight under the Synopsis. (*Id.* at 34). The United States effectively argues that, even if Jacobs was marginally stronger under Criterion B, Offeror #3's superior performance in the more heavily weighted Criterion A reasonably supported its higher ranking. (*Id.*). The United States concludes that Jacobs seeks to reweigh the criteria according to its own preferences and that NGB's judgment falls squarely within its discretion. (*Id.*).

Based on the record and applicable procurement regulations, the Court finds in favor of the United States on the issue of Jacobs's challenge to NGB's ranking decision. Jacobs's contention that its proposal was demonstrably superior to Offeror #3's under Primary Criteria A and B rests on a selective and subjective comparison of individual credentials and evaluative factors. While Jacobs and Offeror #3 received nearly identical adjectival ratings under Criterion A, NGB reasonably assessed the proposals in their entirety, accounting for certifications, demonstrated experience, tenure, and discipline-specific value. (*Compare* AR 6317–19 *with* AR 6328–30). In disciplines where Jacobs claims superiority, such as Project Manager and Architect, NGB's technical evaluators concluded that Offeror #3's personnel held comparative or superior qualifications based on the totality of factors, including more extensive professional registrations and recent project experience. (*Compare* AR 6317 *with* AR 6329). Jacobs's proposal included additional personnel in certain categories, but the Synopsis did not require or reward quantity over quality, nor did it obligate NGB to aggregate qualifications across multiple individuals.

Concerning Criterion B, although Jacobs received more "Outstanding" ratings than Offeror #3, those ratings pertained to a lower-priority sub-criterion. The Synopsis explicitly ranked Criterion A as more important than Criterion B, and it was within NGB's discretion to determine how much weight to assign each criterion and sub-criterion. (AR 2549). Jacobs's suggestion that its proposal should have received a "more Outstanding" rating than Offeror #3's disregards the evaluative scheme set forth in the Synopsis and inappropriately substitutes its own preferred weighting for NGB's reasoned judgment. The Court declines to second-guess technical evaluations, particularly in a procurement governed by FAR subpart 36.6, which affords the agency substantial discretion in subjectively selecting the most highly qualified firms. *See* FAR 36.603(b). Jacobs has not demonstrated that NGB's ranking methodology was arbitrary, capricious, or inconsistent with law, nor has it shown that NGB failed to apply the evaluation criteria as stated. Accordingly, the Court concludes that NGB's decision to rank Offeror #3 above Jacobs was reasonable and supported by the record.

### F. Prejudice and Injunctive Relief

Jacobs has failed to demonstrate any error in NGB's decision and likewise cannot establish prejudice from any alleged mistake. This equally applies to its request for injunctive relief. Injunctions are a "drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation omitted). To obtain permanent injunctive relief, a party must demonstrate: (1) success on the merits; (2) irreparable harm if an injunction does not issue; (3) the balance of harm favors the movant; and (4) that the injunction serves the public interest. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *Amazon Web Servs., Inc. v. United States*, 147 Fed. Cl. 146, 153 (2020). Although "[n]o one factor, taken individually, is necessarily dispositive . . . the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). Because Jacobs has failed to establish success on the merits, there is no need for further analysis. Jacobs's request for a permanent injunction is denied.

## III.    Conclusion

Jacobs failed to establish that a prejudicial error occurred in this procurement for A-E services. Accordingly, Jacobs's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 20), is **DENIED**. The United States' Cross-Motion for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 21), is **GRANTED**.[16]

The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to this Memorandum Opinion within **fourteen (14) days** of its entry to allow the Court to file a public version of the Opinion.

**IT IS SO ORDERED.**

s/    David A. Tapp
DAVID A. TAPP, Judge

---

[16] The Court previously ruled on these motions. (ECF No. 29). This Opinion presents the Court's analysis and directs the entry of judgment.